# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 76

APRIL TERM, A.D. 2026

July 13, 2026

WARREN LIVESTOCK, LLC, a Wyoming
limited liability company; JHD RANCH
LLC, a Wyoming limited liability company;
PILOT PEAK LLC, a Wyoming limited
liability company; and LODGEPOLE
RANCH LLC, a Wyoming limited liability
company,

Appellants
(Petitioners),

v.

BOARD OF COUNTY
COMMISSIONERS, COUNTY OF
ALBANY, WYOMING,

Appellee
(Respondent).

S-25-0250

THOMAS A. and KAREN R. BIENZ; LYNN
MARIE BROUGHTON; BILLY E. BROWN;
K.R. BROWN and D.L. MATTHEW, as
Trustees of the Brown-Matthew Revocable
Trust; ROBERT and MARY BROWNELL;
ROBERT and KATHY L. BUCKARDT;
KELLY CARTER; ANTHONY C. CLASSI
and LINDA D. JOHNSON; MAX D. and LORI
A. COULTHARD; LESLIE A. DARNALL,
Trustee of the Leslie A. Darnall Living Trust;
ROBERTA M. DARNALL, Trustee of the
Roberta M. Darnall Living Trust; DANNY and
ROBERTA DUNLAVY; SANDRA

S-25-0251

FARWELL EIKE, Trustee of the Sandra Farwell Eike Revocable Trust; JOHN BRUCE EMBURY; CLIFFORD D. FERRIS; JESSICA ANN and RAY STUART FERTIG, III; ROBERT F. GARLAND, III, Trustee of the Robert F. Garland Revocable Trust; JD and CANDY HAMAKER; ROBERT F. and CAROLYN W. HELLING; DONALD L. JARVIS; ORY J. JOHNSON; CHERYL L. and LYLE JOHNSTON; KEITH KENNEDY; DEREK J. MANCINHO; JOHN F. NELSON and JUDITH NELSON, Trustees of the Judith E. Nelson Family Living Trust; DANIEL A. NETZEL, Trustee of the Daniel A. Netzel Revocable Trust; JON MICHAEL PIKAL and EVA SIGLINDA FERRE-PIKAL; JAMES L. and SALLY R. RICHARD; HENRY R. RICHTER and RITA ALLMARAS-RICHTER; SHAWN SANDERS and SANDERS PROPERTIES, LLC; KAREN DIANE SINGER; KIMBERLY J. STARKEY, Trustee of the Kimberly J. Starkey Revocable Trust; ROBERT J. STARKEY, JR., Trustee of the Robert J. Starkey, Jr. Revocable Trust; TIMOTHY and KIMBERLY TAYLOR; MARIANNE VINER; FRED C. and PEGGY J. WATERS; THOMAS W. WEBER, Trustee of the Thomas W. Weber Trust; ARNOLD and WANDA WILLEMS; WILLIAM A. WOLF, Trustee of the William A. Wolf Revocable Trust; LYLE HAROLD WOMACK and JANICE KAY WOMACK,

Appellants
(Petitioners),

v.

BOARD OF COUNTY COMMISSIONERS, COUNTY OF ALBANY, WYOMING,

Appellee
(Respondent).

*Appeal from the District Court of Albany County*
*The Honorable Misha E. Westby, Judge*

*Representing Appellants Warren Livestock, LLC; JHD Ranch LLC; Pilot Peak LLC; and Lodgepole Ranch LLC:*
> Mitchell H. Edwards, Nicholas & Tangeman, LLC, Laramie, Wyoming.  Argument by Mr. Edwards.

*Representing Appellants Bienz et al.:*
> Daniel B. Frank, Frank Law Office, P.C., Meriden, Wyoming.  Argument by Mr. Frank.

*Representing Appellee Board of County Commissioners, County of Albany, Wyoming:*
> Matthew E. Ayres, Jennifer M. Curran, Edward Kurt Britzius, Albany County & Prosecuting Attorney's Office, Laramie, Wyoming.  Argument by Mr. Ayres.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, and HILL, JJ.*

*GRAY, J., delivers the opinion of the Court; BOOMGAARDEN, C.J., files a specially concurring opinion, in which FENN, J., joins; HILL, J., files a concurring in part and dissenting in part opinion.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]     In these consolidated appeals, Appellants Warren Livestock, LLC, et al. (Warren Livestock) and Thomas A. and Karen R. Bienz, et al. (Property Owners) (collectively Appellants) seek judicial review under the Wyoming Administrative Procedure Act (WAPA) of the Albany County Board of County Commissioners' (Board) 2023 amendments to zoning regulations known as the Aquifer Protection Overlay Zone (APOZ). The district court upheld the amendments. On appeal, Appellants contend the district court erred when it (1) refused to apply the arbitrary and capricious standard of review, (2) concluded the Board did not exceed its authority when it adopted the 2023 amendments (including the 35-acre minimum lot size), (3) found the amendments were in accordance with the law, and (4) determined the procedures for amending the overlay zone complied with the Wyoming Constitution. We conclude the APOZ amendments were within the Board's authority and did not violate the equal protection provisions of the Wyoming Constitution. We agree informal agency legislation is subject to the arbitrary and capricious standard of review but conclude the APOZ amendments were not arbitrary or capricious. Accordingly, we affirm.

### ISSUES

[¶2]     We merge and rephrase Appellants' issues as:

1.    Did the Board exceed its authority when it adopted zoning regulations to protect the Casper Aquifer?

2.    Do the procedures for amending the overlay zone, which are distinct from procedures used to amend zoning districts, violate Wyoming's constitutional equal protection guarantees?

3.    Does the arbitrary and capricious standard of review apply to agency legislative action?

4.    Were the Board's 2023 APOZ amendments arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

### FACTS

[¶3]     These consolidated cases are before this Court for a second time. As we explained in *Bienz v. Bd. of Cnty. Comm'rs, Cnty. of Albany*, 2024 WY 102, ¶¶ 3–5, 556 P.3d 227, 230–31 (Wyo. 2024) (*Bienz I*), the Casper Aquifer lies east of the City of Laramie in Albany County. It supplies drinking water to many City of Laramie and Albany County

1

residents. Pursuant to the federal Safe Drinking Water Act, 42 U.S.C. § 300h-7,[1] the Wyoming Department of Environmental Quality (WDEQ) developed a Wellhead Protection Program providing criteria and methodologies for delineating aquifer protection areas. *Bienz I*, ¶¶ 3–4, 556 P.3d at 230–31. In 1999, a group of licensed geologists and engineers created the Delineation Report that mapped and identified the Casper Aquifer protection area (CAPA). *Id.* ¶ 4, 556 P.3d at 230–31. The WDEQ approved the report in 2000, and in 2002, the Board adopted the Casper Aquifer Protection Plan (CAPP) incorporating the Delineation Report. *Id.* ¶¶ 4–5, 556 P.3d at 231. The Board then adopted regulations to protect the aquifer. These regulations created the APOZ and within that zone prohibited certain land uses and restricted development (APOZ regulations). *Id.* ¶ 5, 556 P.3d at 231. The Board amended the APOZ regulations in 2023. Appellants sought judicial review of those amendments. *Id.* The district court concluded it lacked jurisdiction because the Board's amendments to the APOZ regulations were legislative and therefore not reviewable under the WAPA. *Id.* ¶ 6, 556 P.3d at 232. Appellants appealed.

[¶4]    In *Bienz I*, the sole issue before this Court was whether administrative legislative actions are reviewable on direct appeal under the WAPA. *Bienz I*, ¶ 2, 556 P.3d at 230. We held that the characterization of administrative action as legislative or adjudicatory did not govern reviewability and concluded that the Board's amendments were reviewable. *Id.* ¶¶ 22–25, 556 P.3d at 235–36. We remanded the matter to the district court. *Id.* ¶ 31, 556 P.3d at 237.

[¶5]    While the matter was pending, the Board amended the APOZ regulations on three separate occasions.[2] On remand from *Bienz I*, the district court first determined which of the challenged amendments remained live and were not mooted by the amendments made to the regulations during litigation. It then addressed Appellants' challenges to the live amendments. Those included challenges to a required 35-acre minimum lot size and a revised procedure for changing the APOZ boundaries. *See* ACZR, Ch.3, § 3.D.7 (APOZ minimum lot size); ACZR, Ch.3, §§ 3.D.5.b & c (APOZ boundary amendments). The district court held the Board had the statutory authority to enact the amendments; the APOZ procedure for amending the APOZ boundary did not violate Wyoming's constitutional equal protection guarantees; and the APOZ 35-acre minimum lot size was not contrary to law or in excess of the Board's authority. Appellants timely appeal.

---

[1] The federal Safe Drinking Water Act provision requiring states to develop wellhead protection programs was effective on August 6, 1996. 42 U.S.C. § 300h-7 (2018). The statute has been amended over time, but none of those amendments pertain to this matter.

[2] On January 16, 2024, the Board adopted an updated APOZ boundary based on the 2023 CAPP's delineation and amended the procedures for changing the APOZ boundary. On December 17, 2024, the Board moved small wastewater facility regulations, previously contained in the APOZ regulations, to the County's Design and Construction Standards for Small Wastewater Facilities and Regulations for Permit to Construct, Install or Modify Small Wastewater Facilities. Finally, in June 2025, the Board changed the requirements for boundary changes, inclusion and exclusion of properties within the APOZ, and the process for making boundary changes.

## DISCUSSION

### I. Nature of the Board's Action: Distinction Between Adjudicatory, Formal Legislative, and Informal Legislative Action

[¶6] Throughout this opinion, we use several related terms to describe the Board's actions including "legislative," "adjudicatory," and other similar distinctions. Although the WAPA and our precedent do not distinguish between formal and informal agency action, other courts do. Various opinions of this Court have referenced cases that employ the formal/informal distinction or have incorporated these terms into the vocabulary of the opinion without definition. While the formal/informal distinction is not part of our administrative law, we use all four terms—legislative, adjudicatory, formal and informal—in this opinion. Because it is helpful to understand these terms and concepts, we define them below.

[¶7] Adjudicatory action applies to identifiable persons and specific situations. It resolves disputed facts or applies to particular past or present circumstances involving specific parties. *Bienz I*, ¶ 28, 556 P.3d at 237 (quoting *Holding's Little Am. v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 670 P.2d 699, 702 (Wyo. 1983) (citing 1 Am. Jur. 2d *Administrative Law* § 164)). Adjudicatory action can be formal—with a public hearing, which is characterized by indicia of the adversarial process such as sworn witnesses, cross-examination, and the introduction of evidence. Adjudicatory action can also be informal—where public comment is solicited, but witnesses are not sworn, and other aspects of the adversarial process are absent. *See N. Laramie Range Found. v. Converse Cnty. Bd. of Cnty. Comm'rs*, 2012 WY 158, ¶ 10, 290 P.3d 1063, 1070 (Wyo. 2012) (making a distinction between informal and formal adjudicatory action).

[¶8] Legislative action is distinguished from judicial power or adjudicatory action in that it "operates in the future, rather than on past transactions and circumstances, and generally, rather than particularly." Legislative action produces "a general rule or policy which applies to a general class of individuals, interests, or situations," whereas adjudicatory functions apply to identifiable persons and specific situations. *Bienz I*, ¶ 28, 556 P.3d at 237 (quoting *Holding's Little Am.*, 670 P.2d at 702); 1 *Admin. L. & Prac.* § 2:33 (3d ed.).

[¶9] Some cases we rely upon—or that our precedent has previously relied upon—draw further distinction between formal and informal legislative action. Formal legislative action (formal rulemaking) involves the creation of a general rule or policy through trial-like, on-the-record procedures. Under the federal Administrative Procedure Act (APA), these procedures are set forth in 5 U.S.C. §§ 556–557. Wyoming does not have a parallel to the federal provisions for legislative or rulemaking action, and such formal procedures are rare and generally considered inappropriate and counterproductive for legislative-type

3

decisions.  1 *Admin. L. & Prac.* § 2:33 (3d ed.); Wyo. Stat. Ann. §§ 16-3-101 through -115.

[¶10]  Informal legislative action (informal rulemaking) is the norm for legislative-type agency or local government rulemaking.  It operates prospectively and produces a general rule or policy applicable to a broad class of persons, properties, or situations, but uses streamlined notice-and-comment procedures rather than trial-type hearings.  These procedures typically include notice, opportunity for public participation (usually written comments), publication of the final action, and a concise statement of reasons.  1 *Admin. L. & Prac.* § 2:33 (3d ed.).

[¶11] Under Wyoming law, the amendments at issue constitute legislative action.  We neither draw a formal/informal distinction nor imply that such distinction is required.

## II.    *Did the Board exceed its authority when it adopted zoning regulations to protect the Casper Aquifer?*

[¶12]   We will "[h]old unlawful and set aside agency action . . . found to be . . . [i]n excess of statutory jurisdiction, authority or limitations or lacking statutory right . . . ."  Wyo. Stat. Ann. § 16-3-114(c)(ii)(C).  Appellants contend the Board exceeded its statutory authority when it enacted the 2023 APOZ amendments.  They assert that environmental regulatory authority rests only with the WDEQ, and the zoning authority delegated to counties does not allow counties to regulate the use of land for the purpose of protecting the quality of the State's air, land, and water resources.

[¶13]   The limited role of counties in the administration of government guides our analysis. *See Bd. of Trs. of Laramie Cnty. v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 2020 WY 41, ¶ 12, 460 P.3d 251, 256 (Wyo. 2020).  Counties are political subdivisions of the state, "created to aid in the administration of government."  *Id.* (quoting *Bd. of Cnty. Comm'rs for Sublette Cnty. v. Exxon Mobil Corp.*, 2002 WY 151, ¶ 22, 55 P.3d 714, 721 (Wyo. 2002)).  Counties "have no sovereignty independent from that of the state, and the only power available to them is the power that has been delegated to them by the state."  *Bd. of Trs. of Laramie Cnty.*, ¶ 12, 460 P.3d at 256–57 (quoting *Seherr-Thoss v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2014 WY 82, ¶ 24, 329 P.3d 936, 946 (Wyo. 2014)); *Carter v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 518 P.2d 142, 144 (Wyo. 1974) ("[T]he legislature may delegate a part of its power over local subjects to municipal corporations, county boards, and other public bodies . . . for the purpose of local self-government.").  Accordingly, counties have only "those powers expressly granted by the constitution or statutory law or reasonably implied from powers granted."  *Bd. of Trs. of Laramie Cnty.*, ¶ 12, 460 P.3d at 257 (quoting *Ford v. Bd. of Cnty. Comm'rs of Converse Cnty.*, 924 P.2d 91, 95 (Wyo. 1996)).  Those powers include:

4

First, those granted by express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the [county], and the power is denied. *Dillon on Municipal Corp.*, 5th ed., [§ 237.] The rule of strict construction does not apply to the mode adopted by the [county] to carry into effect powers expressly or plainly granted, where the mode is not limited or prescribed by the legislature, and is left to the discretion of the [county] authorities. In such a case the usual test of validity of the act of a [county] is whether it is reasonable. *Id.* § 239.

*Id.* ¶ 12, 460 P.3d at 257 (quoting *Schoeller v. Bd. of Cnty. Comm'rs of Park Cnty.*, 568 P.2d 869, 876 (Wyo. 1977)). With these principles in mind, we examine whether the Board had the authority to enact zoning regulations to protect the Casper Aquifer.

[¶14] Wyo. Stat. Ann. § 18-5-201(a) grants zoning authority to counties to promote public health, safety, morals and general welfare:

> **To promote the public health, safety, morals and general welfare of the county, each board of county commissioners may regulate and restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use and other purposes in the unincorporated area of the county.** However, nothing in W.S. 18-5-201 through 18-5-208 shall be construed to contravene any zoning authority of any incorporated city or town. No zoning resolution or plan shall prevent any use or occupancy reasonably necessary to the extraction or production of the mineral resources in or under any lands subject thereto. No board of county commissioners shall require that a land use or physical development be consistent with a local land use plan unless the applicable provisions of the local land use plan have been incorporated into the local zoning regulations. Nothing in W.S. 18-5-201 through 18-5-208 shall be construed to allow any board of county commissioners, through the establishment of minimum lot size requirements or otherwise, to prevent residential or agricultural uses authorized for land divisions that are exempt from

5

> subdivision requirements pursuant to W.S. 18-5-303(a)(i). No zoning resolution or plan shall regulate and restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for the use of a private school as defined in W.S. 21-4-101(a)(iii) in any manner different from a public school . . . .

Wyo. Stat. Ann. § 18-5-201 (LexisNexis 2025) (emphasis added). This is a "broad grant of authority." *Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs*, 2012 WY 163, ¶¶ 26–27, 292 P.3d 855, 862 (Wyo. 2012).

> This broad grant of authority derives from the "police power inherent in government, the constitution, and statutes passed pursuant to it." 1 E.C. Yokley, *Zoning Law and Practice* § 3-1 (4th ed. 2008). It includes both the **express power to enact zoning ordinances, and the "implied power to do those things which would make its express power to regulate and restrict the use of buildings and land in unincorporated areas of the county meaningful**." *Snake River Venture* [*v. Bd. of Cnty. Comm'rs, Teton Cnty.*], 616 P.2d [744,] 752 [(Wyo.1980)] (quoting *Schoeller v. Bd. of Cnty. Comm'rs of Park Cnty.*, 568 P.2d 869, 874 (Wyo. 1977)). However, "**the zoning authority of counties and municipalities is limited to that derived from state statute, and county actions inconsistent with the statutes may mandate reversal**." *Northfork* [*Citizens For Responsible Dev. v. Bd. of Cnty. Comm'rs of Park Cnty.*, 2010 WY 41], ¶ 23 n.5, 228 P.3d [838,] 847 n.5 [(Wyo. 2010)].

*Wilson Advisory Comm.*, ¶ 27, 292 P.3d at 862 (emphasis added).

[¶15] Albany County has "broad authority to shape its destiny, control its growth, and determine how best to promote the health, safety, morals, and general welfare of its citizens." *Bd. of Cnty. Comm'rs of Teton Cnty. v. Crow*, 2003 WY 40, ¶ 42, 65 P.3d 720, 734 (Wyo. 2003); Wyo. Stat. Ann. § 18-5-201; *see also* 4 Patricia E. Salkin, *American Law of Zoning* § 36:7 (5th ed. 2026) ("Zoning has long been a tool of local governments in regulating the local health and quality of life, and it has been reinvented to focus on environmental quality. Hence, the zoning power has been used to control the location of pollution sources, to set minimum lot sizes for the purposes of aquifer protection, and to establish environmental quality districts that prevented erosion and landslides."); 83 Am. Jur. 2d *Zoning and Planning* § 60 (2026) ("The protection of the environment, maintaining an ecological balance, water quality, and wildlife are all valid objects of the exercise of a zoning authority's police power."); *Salamar Builders Corp. v. Tuttle*, 275 N.E.2d 585, 589

(N.Y. 1971) ("it is certain that the prospect of water pollution from the inadequate spacing of septic tanks in such rocky and hilly terrain provided more than adequate reason for the upzoning"); *Timber Trails Assocs. v. Plan. & Zoning Comm'n of Town of Sherman*, 916 A.2d 99, 111–12 (Conn. App. Ct. 2007) (affirming zoning amendments that "lower the density of development, maintain the rural character of the town and protect the area's watersheds to sustain high water quality" and "protect the quality of drinking water in areas including neighboring watersheds," concluding "the amendments [that] regulate the size and land composition of residential lots . . . are consistent with the requirement . . . that zoning regulations 'promote health and the general welfare'").

[¶16]   The word "health" means "the condition of being sound in body, mind, or spirit[;] . . . the general condition of the body," *Health*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/health (last visited June 30, 2026); the word "safety" means "the condition of being safe from undergoing or causing hurt, injury, or loss," *Safety*, Merriam-Webster, *supra*; and, the word "welfare" means "the state of faring or doing well: thriving or successful progress in life: a state characterized esp. by good fortune, happiness, well-being, or prosperity." *Crow*, ¶ 42, 65 P.3d at 734 (citing Webster's Third New International Dictionary, 2594 (1986)).  There is no doubt that protection of the Casper Aquifer and its water quality promotes the public health, safety, and general welfare of the county.  *See id.* (holding that Teton County's zoning regulations enacted to promote "rural" "western" "character" served the welfare of its citizens and were within the zoning authority delegated by Wyo. Stat. Ann. § 18-5-201(a)).

[¶17]   We have held that the broad authority conferred under Wyo. Stat. Ann. § 18-5-201(a) "is limited by state statute, and the general grant of power to [counties] to adopt zoning laws in the interest of public welfare does not permit the local governing bodies to override the state law and the policies supporting it." *Seherr-Thoss*, ¶ 24, 329 P.3d at 946; *see also Teton Cnty. Bd. of Cnty. Comm'rs v. Bd. of Land Comm'rs*, 2025 WY 48, ¶ 18, 567 P.3d 675, 681 (Wyo. 2025).  Appellants argue that the WDEQ has exclusive authority to regulate water quality in the state, and county zoning regulations to protect the aquifer conflict with that authority.

[¶18]   The Wyoming Constitution grants "general supervision of the waters of the state and of the officers connected with its distribution" to the state engineer.  Wyo. Const. art. 8, § 5.  The legislature granted the WDEQ the authority to promulgate "rules, regulations, standards and permit systems to promote the purposes of" the Wyoming Environmental Quality Act (the Act).  Wyo. Stat. Ann. § 35-11-302(a).  Section 35-11-102 states the purpose of the Act:

> **Policy and purpose.**
>
> Whereas pollution of the air, water and land of this state will imperil public health and welfare, create public or private

nuisances, be harmful to wildlife, fish and aquatic life, and impair domestic, agricultural, industrial, recreational and other beneficial uses; **it is hereby declared to be the policy and purpose of this act to enable the state to prevent, reduce and eliminate pollution; to preserve, and enhance the air, water** and reclaim the land of Wyoming; **to plan the development, use, reclamation, preservation and enhancement of the air, land and water resources** of the state; to preserve and exercise the primary responsibilities and rights of the state of Wyoming; **to retain for the state the control over its air, land and water and to secure cooperation between agencies of the state, agencies of other states, interstate agencies**, and the federal government **in carrying out these objectives**.

Wyo. Stat. Ann. § 35-11-102 (LexisNexis 2025) (emphasis added).[3]

---

[3] The statute envisions cooperation with local entities, including counties and municipalities. For example, it states,

> [WDEQ] rules, regulations, standards and permit systems shall prescribe:
> (i)     Water quality standards specifying the maximum short-term and long-term concentrations of pollution, the minimum permissible concentrations of dissolved oxygen and other matter, and the permissible temperatures of the waters of the state;
> (ii)     Effluent standards and limitations specifying the maximum amounts or concentrations of pollution and wastes which may be discharged into the waters of the state;
> (iii)     Standards for the issuance of permits for construction, installation, modification or operation of any public water supply and sewerage system, subdivision water supply, treatment works, disposal system or other facility, capable of causing or contributing to pollution;
> (iv)     Standards for the definition of technical competency and the certification of operating personnel for community water systems and nontransient noncommunity water systems, sewerage systems, treatment works and disposal systems and for determining that the operation shall be under the supervision of certified personnel. **Prior to recommending these standards to the director, the administrator shall consult with affected municipalities, water and sewer districts, counties and treatment operators**;
> (v)     Standards for the issuance of permits as authorized pursuant to section 402(b) of the Federal Water Pollution Control Act [33 U.S.C. § 1342(b)] as amended in 1972, and as it may be hereafter amended;
> .     .     .

8

[¶19] To promote the purpose of the Act, the WDEQ promulgated water quality standards, including standards for protecting groundwater from surface and subsurface discharges. WDEQ Water Quality Rules (Rules), ch. 8, § 4. It also set standards for regulating and permitting septic systems, Rules, ch. 25, and for subdivision water supply and sewage systems. Rules, ch. 23, § 3(c) (requiring subdivisions to "meet or exceed the applicable [water quality] standards"). Chapter 8, § 3(a) of the Rules recognizes "[a]ll waters, including Groundwaters of the State . . . are the property of the State; and control of the beneficial use of waters of the State resides with the Wyoming State Engineer." This section also states "[p]rotection shall be afforded all underground water . . . . Water being used for a purpose identified in W.S. 35-11-102 and 103(c)(i) shall be protected for its intended use and uses for which it is suitable." Rules, ch. 8, § 3(c).

[¶20] Wyo. Stat. Ann. § 35-11-304(a)(iii) provides for delegation to "municipalities, water and sewer districts or counties" the "authority to enforce and administer within their boundaries the provisions of W.S. 35-11-301(a)(iii) and (v)" and requires the "local governmental entity" to establish "rules, regulations and standards for the issuance of permits . . . which . . . shall be at least as stringent as those promulgated by the state under W.S. 35-11-302(a)(iii)[.]"[4] Wyo. Stat. Ann. § 18-5-306(c) requires counties to send subdivision permit applications to the WDEQ for its review of the "adequacy of the proposed sewage system and proposed water supply system" but allows the WDEQ to delegate "authority to the county to review any reports or studies . . . directed at determining the safety and adequacy of the proposed sewage or water supply system contained as part of a subdivision application." Wyo. Stat. Ann. § 18-5-306(c)(ii).

---

(ix) Standards for housed facilities where swine are confined, fed and maintained for a total of forty-five (45) consecutive days or more in any twelve (12) month period and the feedlot or facility is designed to confine an equivalent of one thousand (1,000) or more animal units. **If any county adopts a land use plan or zoning resolution which imposes stricter requirements than those found in subparagraph (C) of this paragraph, the county requirements shall prevail.**

. . .

(xi) **Standards for subdivision applications submitted to the department under W.S. 18-5-306. The administrator shall consult with county commissioners and the state engineer's office in developing standards to recommend to the director.**

Wyo. Stat. Ann. § 35-11-302(a)(i)–(v), (ix), (xi) (LexisNexis 2025) (emphasis added).

[4] Pursuant to Wyo. Stat. Ann. § 35-11-304, the WDEQ delegated authority to permit and enforce small wastewater permits to Albany County. In addition, Wyoming's Source Water Assessment and Protection Program (SWPP) allows local communities to develop Source Water Protection Plans to protect drinking water and incorporates Wyoming's Wellhead Protection (WHP) Program, a voluntary program under which local WHP plans are developed and can be reviewed by the WDEQ.

[¶21] Warren Livestock argues the 2023 APOZ amendments, including the 35-acre minimum lot size requirement, supplant WDEQ authority over the review of subdivision applications as they relate to water quality and potential septic system impact on water quality. Warren Livestock cites Wyo. Stat. Ann. § 18-5-306(a)(iv)(C) and Rules, ch. 23. Section 18-5-306 sets forth the minimum information that must be submitted for water and sewage systems before a subdivision permit may be granted. It provides:

> (a) The board [of county commissioners] shall require . . . the following information to be submitted with each application for a subdivision permit . . . :
>
> .   .   .

The information requirements include:

> (iv) A study evaluating the sewage system proposed for the subdivision and the adequacy and safety of the system.
>
> > (A) Identification of the type of sewage system to serve the subdivision . . . ;
> >
> > (B) . . . a report submitted by the subdivider as to the adequacy and safety of the proposed sewage system. . . .
> >
> > (C) Where individual on-lot sewage systems are proposed by the subdivider, a report submitted by the subdivider shall document the safety and adequacy of the proposed on-lot sewage systems including the following:
> >
> > > (I) Adequacy of separation distances;
> > >
> > > (II) Separation of drainfield relative to groundwater and impervious soils;
> > >
> > > (III) Suitability of the subdivision soil conditions;
> > >
> > > (IV) Suitable topography;
> > >
> > > (V) Proposed population density;

(VI) Protection of groundwater uses; and

(VII) Watersheds located on or draining into, under or over the proposed subdivision.

Wyo. Stat. Ann. § 18-5-306(a)(iv)(A)–(C). The Rules set out minimum standards for subdivision sewage and water supply systems. Rules, ch. 23, §§ 7–8. They require WDEQ to review subdivision applications for proof of compliance with discharge and water quality regulations. *See, e.g.*, Rules, ch. 23, § 4 (requiring submittal of "the portions of [the subdivision] application containing evaluations of the proposed sewage system and water supply system to the [WDEQ] for review of the safety and adequacy of the proposed sewage system and proposed water supply system"). The 2023 APOZ amendments do not conflict with Wyo. Stat. Ann. § 18-5-306, WDEQ rules governing discharge, water quality rules, or application review.

[¶22] Nothing in the Wyoming Constitution, the Act, or the WDEQ regulations limits county authority to zone for public health, safety, or general welfare, including protection of the Casper Aquifer. *See River Springs Liab. Co. v. Bd. of Cnty. Comm'rs of Cnty. of Teton*, 899 P.2d 1329, 1336 (Wyo. 1995) ("[I]f the state has the authority to regulate, but excludes certain instances from its regulation, the local authority may invoke its regulatory power. We recognize the authority of the Board to regulate these activities so long as regulation by the county does not conflict with a regulation by the state.").

[¶23] Both the Act and WDEQ rules expressly anticipate local participation in the protection of public water resources. The Act authorizes delegation to local authorities, and the WDEQ rules allow local authorities to enact permitting standards "at least as stringent" as those of the State. Consistent with this cooperative framework, WDEQ's Water Quality Division "encourage[d] Albany County to consider implementing additional aquifer protection measures that may help address water quality concerns." The 2023 APOZ amendments do not conflict with, override, or supplant any areas of exclusive WDEQ control, including water quality standards or discharge permits. In particular, the 35-acre minimum lot size does not conflict with Wyo. Stat. Ann. § 18-5-306 or Chapter 23 of the Rules. Section 18-5-306 and the Rules establish minimum standards and procedures for water supply and sewage systems in approving subdivision applications. The standards are separate from and do not preempt land use restrictions—such as minimum lot size—within the APOZ. *See Seherr-Thoss*, ¶ 24, 329 P.3d at 946.

[¶24] We conclude the Board possessed the authority to adopt the 2023 APOZ amendments, including the 35-acre minimum lot size requirement, to protect the Casper

Aquifer. *See River Springs*, 899 P.2d at 1336; Salkin, *supra*, at § 36:7; 83 Am. Jur. 2d *Zoning and Planning* § 60.

### III. *Do the procedures for amending the overlay zone, which are distinct from procedures used to amend zoning districts, violate Wyoming's constitutional equal protection guarantees?*

[¶25]  Warren Livestock contends that the Board's adoption of rules for amending an overlay zone violates the Wyoming Constitution's equal protection guarantees for two reasons.

[¶26]  First, Warren Livestock asserts the 2023 APOZ amendments created two different procedures for amending the boundary of the APOZ, thereby violating equal protection. The first procedure allowed inclusion or exclusion of property based upon the CAPP and its updates, and the second allowed "[p]reviously surveyed parcels" to be excluded from the APOZ if there was "clear and convincing evidence" of at least 75 feet of undisturbed Satanka Shale overlying the Casper Formation.  APOZ § 3.D.5.b-c.  The 2024 and 2025 amendments to the APOZ regulations have eliminated the disputed language.[5]  Now any parcel can seek exclusion based on the 75-foot Satanka Shale thickness test, without the "previously surveyed" limitation or the heightened "clear and convincing" burden of proof. Because the 2024 and 2025 amendments to the APOZ regulations have eliminated the challenged provisions and, with them, the controversy, Warren Livestock's first argument is moot.  "[C]ourts will not consume their time dealing with moot questions." *Powder River Basin Res. Council v. Wyo. Dep't of Env't Quality*, 2020 WY 127, ¶¶ 10, 18, 473 P.3d 294, 297, 299 (Wyo. 2020) (citing *Matter of Birkholz*, 2019 WY 19, ¶ 2, 434 P.3d 1102, 1103–04 (Wyo. 2019) (a case is moot when "the determination of an issue will have no practical effect on the existing controversy," and the court will dismiss the appeal if "events occur during the pendency of [the] appeal that . . . make determination of the issues unnecessary" (quoting *In re SNK*, 2005 WY 30, ¶ 6, 108 P.3d 836, 838 (Wyo. 2005)))). None of the recognized exceptions to the mootness doctrine apply.  *See Operation Save Am. v. City of Jackson*, 2012 WY 51, ¶¶ 22–23, 275 P.3d 438, 448–49 (Wyo. 2012).

[¶27]  Next, Warren Livestock argues an equal protection violation arises from the 2023 APOZ amendment's procedures for APOZ boundary changes.  These procedures differ from those required to amend an Albany County Zoning Resolution (ACZR) zoning district.  We will hold unlawful any agency action "found to be . . . [c]ontrary to constitutional right, power, privilege or immunity." Wyo. Stat. Ann. § 16-3-114(c)(ii)(B). Wyoming's constitution requires a law to operate alike upon all persons or property under

---

[5] Currently, the APOZ boundary can be amended "based upon modifications to the CAPA as part of revisions to the CAPP" following legislative zoning district amendment procedures or based on "the location of at least seventy-five (75) feet of undisturbed Satanka Shale thickness under the property or relevant portion of the property."  ACZR Ch. 3, § 3. D. 3(b)(1)(ii).

the same circumstances and conditions. Wyo. Const. art. 1, § 34 ("All laws of a general nature shall have a uniform operation."). "[E]qual protection principles operate to ensure that legislatively created classifications bear a rational relationship to a legitimate state concern." *Mills v. Reynolds*, 837 P.2d 48, 53 (Wyo. 1992). Equal protection "does not require things which are different . . . to be treated in law as though they were the same." *Reiter v. State*, 2001 WY 116, ¶ 26, 36 P.3d 586, 594 (Wyo. 2001).

[¶28] When a statute or regulation affects only ordinary economic or social welfare interests, courts apply the rational basis test. Under this deferential standard, a classification does not violate equal protection so long as it is rationally related to a legitimate governmental interest. *State v. Johnson*, 2026 WY 1, ¶ 51, 582 P.3d 380, 400 (Wyo. 2026); *Mills*, 837 P.2d at 53–54. In conducting rational basis review, courts must apply well-established guiding principles:

> Under the rational basis test, a classification does not violate equal protection as long as it is rationally related to a legitimate governmental interest. . . . In conducting a rational basis review, we must keep a number of principles in mind. Although the rational basis standard is not toothless, "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices and line-drawing." *Greenwalt* [*v. Ram Rest. Corp. of Wyo.*, 2003 WY 77], ¶ 39, 71 P.3d [717,] 730–31 [(Wyo. 2003)]. We review the classification with a strong presumption it is valid. *Id.* "[The] party attacking the rationality of the legislative classification has the heavy burden of demonstrating the unconstitutionality of a statute beyond a reasonable doubt." *Id.*

*Martin v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 2022 WY 21, ¶ 31, 503 P.3d 68, 78 (Wyo. 2022).

[¶29] Warren Livestock contends the 2023 APOZ amendments violate equal protection by providing different procedures and notice requirements for APOZ boundary amendments from those applicable to general zoning district amendments. Specifically, the 2023 APOZ amendments state, "The zoning district amendment provisions and procedures of Section 5 of this Chapter [of the ACZR] are inapplicable to APOZ boundary amendments." Instead, APOZ boundary amendments are to be made "in accordance with W.S. § 18-5-202 and the Wyoming Administrative Procedure Act, W.S. §§ 16-3-101 through -115." Warren Livestock argues differences between the zoning district amendment procedure and the APOZ boundary amendment procedure regarding notice and

procedure treat similarly situated people differently.[6]  Warren Livestock does not explain how the notice and procedure requirements under the WAPA differ from the notice and procedure requirements of the ACZR.  It does, however, argue that the Board amended these provisions because it failed to follow the ACZR procedures (among other procedural requirements, the ACZR requires notice of proposed zoning district amendments be sent to property owners at least fourteen days prior to consideration.  ACZR, Ch.3, § 5.D.2.) when it amended the APOZ regulations.[7]

[¶30]  The Board asserts treating APOZ boundary amendments differently than zoning district amendments is "rationally related to the County's legitimate interest in protecting the Casper Aquifer."  We find the County's position persuasive.

[¶31] Zoning district amendments change the underlying zoning classification of a property (e.g., from agricultural to residential or commercial).  *See* ACZR, Ch.3, § 2 (establishing zoning districts, e.g., agricultural, rural residential, urban residential, commercial, and industrial); ACZR Ch.3. § 5 (zoning district amendments).  In contrast, overlay zones impose additional standards on development, subdivisions, and uses within one or more underlying zoning districts.  *See* ACZR Ch.3. § 3.  According to the Board, the purpose of the APOZ is to "protect groundwater resources that supply Public Water Systems (PWS) and Albany County residents within the defined recharge area for the Casper Aquifer" and "when possible prevent the contamination of the groundwater within the Casper Aquifer."  The Board contends these separate procedures treat similarly situated properties alike—all properties within the APOZ are subject to the same boundary

---

[6] Prior to the adoption of the 2023 APOZ amendments, the APOZ regulations set forth processes for boundary amendments that were different from the ACZR zoning district amendment process.  Exclusion of property from the APOZ required "clear and convincing evidence provided by a professional geologist or hydrogeologist that at least seventy-five (75) feet of undisturbed Satanka Formation overlies the Casper Formation" at the property sought to be excluded.  In addition, a request for exclusion had to follow the ACZR's development proposal notice requirements (including notice to contiguous property owners, notice in the newspaper, and placement of a sign on the property), *see* ACZR Ch.3, § 5. C.  Inclusion of property within the APOZ required a written request that included a professional geologist or hydrogeologist report showing that the "property situated west of the delineated APOZ western boundary . . . has less than seventy-five (75) feet of Satanka Formation" beneath it.  Inclusion required independent investigation by the County, notice in accordance with WAPA, notice to the affected property owners, and notice of hearings before the Planning and Zoning Commission and the Board.  These procedures were not the same as those for zoning district amendments found in the ACZR.  ACZR, Ch.3, § 5.

[7] It is unclear whether, in addition to its equal protection argument, Warren Livestock is asserting the Board failed to follow notice requirements contained in the APOZ or the ACZR.  If so, Warren Livestock cites no authority in support of its argument, and we decline to address it for that reason.  *See Johnston v. Ernst*, 2026 WY 2, 581 P.3d 1120, 1127 n.2 (Wyo. 2026); *Matter of TJH*, 2021 WY 56, ¶ 32, 485 P.3d 408, 418 (Wyo. 2021) ("we do not ordinarily consider issues which are not supported by proper citation of authority and cogent argument").  We note, however, that the Board provided a "Notice of Consideration of APOZ Amendments" and received and considered numerous public comments (written and through the hearing process) before adopting the APOZ amendments.

amendment rules, while all properties in zoning districts are subject to the same rules governing amendments to their underlying zoning districts.

[¶32] The Board has "broad authority to promulgate zoning ordinances[,]" and "considerable discretion in the formulation of its land development regulations[,]" including promulgating procedures for amending zoning districts and overlay zones. *Wilson Advisory Comm.*, ¶¶ 26, 54, 292 P.3d at 862, 869; *see* Wyo. Stat. Ann. § 18-5-201. Because the APOZ serves a specialized protective function, the Board adopted a more tailored procedure for boundary amendments than that used for underlying zoning districts. This distinction treats similarly situated properties alike. All properties within the APOZ are subject to the same boundary amendment rules, while properties outside the overlay remain governed by the standard zoning district amendment process. The classification is therefore rationally related to the County's legitimate governmental interest in protecting the Casper Aquifer. It does not violate the Wyoming Constitution's equal protection guarantees.

### IV.    Does the arbitrary and capricious standard of review apply to agency legislative action?

[¶33]   The WAPA sets forth standards for judicial review of agency action. It provides:

> To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> > (i)    Compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > **(ii)    Hold unlawful and set aside agency action, findings and conclusions found to be:**
> >
> > > **(A)    Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law**;
> > >
> > > (B)    Contrary to constitutional right, power, privilege or immunity;

15

(C)    In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D)    Without observance of procedure required by law; or

(E)    Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2025) (emphasis added).

[¶34]   This Court has not yet considered whether the arbitrary and capricious standard of review applies to agency rulemaking.  Wyo. Stat. Ann. § 16-3-114(c) "contains several different standards of review, not all of which apply in any given instance."  *Wilson Advisory Comm.*, ¶ 18, 292 P.3d at 861 (citing *Northfork Citizens For Responsible Dev. v. Bd. of Cnty. Comm'rs of Park Cnty.*, 2010 WY 41, ¶ 17, 228 P.3d 838, 844–45 (Wyo. 2010) (citing *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶¶ 8–26, 188 P.3d 554, 557–62 (Wyo. 2008))).  Section 16-3-114(c) does not distinguish between adjudicatory and legislative agency action.

[¶35]   In *Bienz I*, we distinguished between adjudicatory and legislative action, held agency legislative action is reviewable, *Bienz I*, ¶¶ 10–20, 556 P.3d at 232–35, and set forth a framework for reviewing agency legislative action.  *Id.* ¶¶ 25–30, 556 P.3d at 236–37.  Relevant here, we said, "we will review agency legislative action to determine whether an agency action was '[c]ontrary to constitutional right, power, privilege or immunity'; was not 'in accordance with law'; was '[i]n excess of statutory jurisdiction, authority or limitations or lacking statutory right'; or was divergent from its own rules."  *Id.* ¶ 26, 556 P.3d at 236–37 (quoting Wyo. Stat. Ann. § 16-3-114(c)(ii)(A)–(D)).  On remand, the district court relied upon this language and reasoned that because arbitrary and capricious review was not expressly articulated, it was not a standard the courts should apply to review agency legislative action.  Appellants assert the district court erred when it determined the arbitrary and capricious standard of review does not apply to agency legislative action.  We agree with Appellants and take this opportunity to address the application of the arbitrary and capricious standard of review to agency legislative action.

[¶36]   This Court has previously addressed the application of both the substantial evidence standard and the arbitrary and capricious standard in contested cases.  In *Dale v. S & S Builders*, we explained the distinction between these two primary standards of review.  *Dale*, ¶¶ 9–25, 188 P.3d at 557–61.  Historically, the arbitrary and capricious standard has been used to review informal adjudications, while the substantial evidence standard has traditionally been applied to review evidentiary findings made after formal, trial-type agency proceedings.  *Id.* ¶ 20, 188 P.3d at 560–61 (quoting federal authority).  We held

16

that **the substantial evidence standard applies whenever this Court reviews an agency's evidentiary rulings or findings of fact**. *Id.* ¶ 22, 188 P.3d at 560–61. Specifically, when a hearing examiner determines that the burdened party failed to meet its burden of proof, we review the record to determine whether substantial evidence supports the agency's decision. We explained that "[t]he arbitrary and capricious standard [is] a '"safety net" to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard.'" *Id.* ¶ 23, 188 P.3d at 561 (quoting *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 91, ¶ 23, 49 P.3d 163, 172 (Wyo. 2002), *holding modified by Dale*, ¶ 23, 188 P.3d at 561). We "refine[d] [the arbitrary and capricious standard] to more carefully delineate that it is not meant to apply to true evidentiary questions." *Dale*, ¶ 23, 188 P.3d at 561.

[¶37]   In *N. Laramie Range Found.*, we addressed the application of the arbitrary and capricious standard of review to board decisions resulting from informal adjudicatory hearings. There, two cases were consolidated on appeal; one of those cases "was not a formal trial-type or contested case . . . , but an informal [adjudicatory] hearing [was held] where public comment was solicited" on the question of whether a wind energy conversion system permit should be granted. *N. Laramie Range Found.*, ¶ 10, 290 P.3d at 1070. "The witnesses were not sworn, comment times were limited and there was no typical cross-examination or other indicia of a true adversarial process." *Id.* We distinguished between formal agency contested cases and decision-making, as in *Dale*, and informal agency hearings and decision-making. *Id.* ¶¶ 13–14, 290 P.3d at 1070–71. We concluded, "federal precedent and learned treatises all indicate the arbitrary and capricious standard of review applies to administrative proceedings which were not conducted as trial-type adjudications or contested cases . . ." and we applied the arbitrary and capricious standard of review. *Id.* ¶ 18, 290 P.3d at 1072.

[¶38]   We now turn to the application of the arbitrary and capricious standard to agency rulemaking. While this Court has not addressed the application of the arbitrary and capricious standard to agency rulemaking in a published opinion, the issue has been thoroughly examined under the federal APA, and we have previously found federal precedent interpreting the federal APA persuasive when applying the arbitrary and capricious standard under Wyoming law. *See id.* ¶ 13, 290 P.3d at 1070–71 (discussing the historical application of the arbitrary and capricious standard to informal agency actions under the federal APA and noting the similarity between 5 U.S.C. § 706 and Wyo. Stat. Ann. § 16-3-114(c)). We conclude, as did the Court of Appeals, that it was.").

[¶39]   In *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), the United States Supreme Court held the National Highway Traffic Safety Administration (NHTSA) acted arbitrarily and capriciously when it revoked the motor vehicle safety standard requiring new vehicles to be equipped with passive restraints. *Motor Vehicle Mfrs.*, 463 U.S. at 46, 103 S.Ct. at 2868

("The ultimate question before us is whether NHTSA's rescission of the passive restraint requirement of Standard 208 was arbitrary and capricious. The Supreme Court concluded that the arbitrary and capricious standard applies to judicial review of informal agency rulemaking:

> Both the Motor Vehicle Safety Act and the 1974 Amendments concerning occupant crash protection standards indicate that motor vehicle safety standards are to be promulgated under the informal rulemaking procedures of § 553 of the Administrative Procedure Act. 5 U.S.C. § 553 (1976). The agency's action in promulgating such standards therefore may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

*Motor Vehicle Mfrs.*, 463 U.S. at 41, 103 S.Ct. at 2865.

[¶40] We agree with this approach. Generally, adjudicatory agency action that is developed on a record is reviewed under the substantial evidence standard, while other administrative actions, including legislative-type action, are reviewed under the arbitrary, capricious, or abuse of discretion standard. *See* Wyo. Stat. Ann. § 16-3-114; 6 Jacob A. Stein & Glenn A. Mitchell, *Administrative Law* § 51.02[2], at 51–144 (2024); *Wilson Advisory Comm.*, ¶ 20, 292 P.3d at 861 ("Arbitrariness review generally applies to the results of an informal process." (quoting 33 Charles A. Wright & Charles H. Koch, Jr., *Federal Practice and Procedure* § 8334 (2006))). At the same time, all types of agency action are subject to "safety net" arbitrary and capricious review. *See Wilson Advisory Comm.*, ¶ 18, 292 P.3d at 861 ("We apply the substantial evidence standard in contested cases, with the added 'safety net' analysis under the arbitrary and capricious standard. However, we apply only the arbitrary and capricious standard when reviewing agency action resulting from informal non-contested case proceedings." (citation omitted)).

[¶41] We therefore conclude that agency proceedings that involve evidentiary findings are reviewed under the substantial evidence standard, with the arbitrary and capricious standard serving as an additional safety net. In contrast, agency actions not developed on a closed record are reviewed under the arbitrary and capricious standard. The district court erred in concluding the arbitrary and capricious standard of review does not apply to the APOZ amendments.

18

## V. Were the Board's 2023 APOZ amendments arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

[¶42] The Property Owners argue the Board's APOZ amendments "lacked a rational basis" and the Board's imposition of the 35-acre minimum lot size in the APOZ was arbitrary and capricious.[8] Warren Livestock contends the amendments and the 35-acre minimum lot size were "arbitrary, capricious, not in conformance with the law, [and] done without observing required procedure." Together, Appellants make four arguments. First, they contend the amendments (including the 35-acre minimum lot size) are not supported by data or findings of "any significant risk from county residential uses to the Casper Aquifer[.]" Second, they argue that by creating a minimum lot size in the APOZ, the Board effectively rezoned the area as agricultural use. Third, they contend the 35-acre minimum lot size prohibits subdivision of land which is contrary to Wyoming statutes. Finally, they claim the minimum lot size requirement prevents them from subdividing their land in the future.

> The arbitrary and capricious standard generally requires a rational basis for agency action:
>
>> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.
>
> *Gilbert* [*v. Bd. of Cnty. Comm'rs of Park Cnty.*, 2010 WY 68], ¶ 10, 232 P.3d 17 at 24 [(Wyo. 2010)] (quoting *Dale*, ¶ 12, 188 P.3d at 559). *See also N. Mun. Distribs. Grp. v. F.E.R.C.*, 165 F.3d 935, 941 (D.C. Cir. 1999). ("Upon examining the record the court inquires whether it can discern a rational connection between the facts found and the choice made by the [agency] . . . ."). This standard also works as a "'safety net' to catch agency action which . . . is not easily categorized or fit to any one particular standard." *Dale*, ¶ 23, 188 P.3d at 561 (quoting

---

[8] The 2023 amendment mandating a minimum lot size provides:

> 7. Minimum Lot Size: Minimum lot size within the APOZ shall be 35 acres[.]

APOZ § 3.D.7. The 2023 amendment also included a single-dwelling restriction. The Board abandoned that restriction in its 2024 amendments.

*Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*,
2002 WY 91, ¶ 23, 49 P.3d 163, 172 (Wyo. 2002)).

*Wilson Advisory Comm.*, ¶ 21, 292 P.3d at 861; *see also Motor Vehicle Mfrs.*, 463 U.S. at 42–43, 103 S.Ct. at 2866 (Under the arbitrary and capricious standard, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute. . . . The scope of review . . . is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962))); James T. O'Reilly, *Administrative Rulemaking* § 16:2 (2026 ed.) ("Courts reverse under the arbitrary and capricious standard only if the agency has relied on factors that Congress has not intended it to consider, has entirely failed to consider an important aspect of the problem, or has offered an explanation for that decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise . . . 'it most emphatically remains the duty of [the] court[s] to ensure that an agency engage the arguments raised before it.'" (quoting *Elec. Power Supply Ass'n v. FERC*, 753 F.3d 216, 224 (D.C. Cir. 2014), *rev'd and remanded*, 577 U.S. 260, 136 S.Ct. 760, 193 L.Ed.2d 661 (2016), *as revised* (Jan. 28, 2016))). Under the arbitrary and capricious standard, we "review the entire record to determine whether the agency reasonably could have made its finding[s] and order based upon all the evidence before it." *Wilson Advisory Comm.*, ¶ 21, 292 P.3d at 861 (quoting *Gilbert v. Bd. of Cnty. Comm'rs of Park Cnty.*, 2010 WY 68, ¶ 10, 232 P.3d 17, 24 (Wyo. 2010)).

## A.    Data and Findings

[¶43] Property Owners assert the amendments to the APOZ, including the 35-acre minimum lot size, are not based on any geologic or hydrologic need. They cite water quality data supporting their position that the water in the Casper Aquifer is not at risk of contamination, and they highlight errors in the data relied upon by the Board when it enacted the amendments. The Property Owners presented data that nitrate levels in the Casper Aquifer remain well below Environmental Protection Agency (EPA) standards in support of their position that there is no credible evidence of a current threat justifying the APOZ restrictions. This data includes the following:

- The City of Laramie's water quality in its public water supply wells has not changed for many years (the Turner, Pope, Soldier and Spur wells have nitrate levels generally below 2.2 mg/L, well below the EPA standard of <10 mg/L).

- Longitudinal study of private wells by professional geologist Dr. Robert Starkey shows no upward trend in nitrate levels.

- The City of Laramie's 2009 and 2010 sampling of private wells showed that most private wells had nitrate levels below EPA standards (97% below 10 mg/L) and the average nitrate levels for the areas where the wells were tested was "well below" EPA standards.[9]

- A 2009 memorandum from the City of Laramie Community Development Department Water Resources Specialist and Community Development Director to the Laramie City Council stated, "There is no indication at this time that there is an *immediate* threat of nitrate-nitrogen contamination to City wells."

- The 2017 United States Geological Survey (USGS) sampling of the South well tested for 63 contaminants, and nitrogen and oxygen isotopes were also tested to determine the source of nitrates. No contaminants were detected, the source of nitrates was inconclusive, and nitrate levels were "well below" EPA standards.

[¶44] The Property Owners further point out claimed inaccuracies in the data the Board relied upon in adopting the amendments. They claim the 2019 Septic System Impact Analysis (2019 Wenck study) is unreliable or insufficient and scientifically flawed and incomplete because only the upper 25% of the vadose zone was sampled, the study failed to test the critical interface between the unsaturated Casper Formation and the saturated Casper Aquifer, and the monitoring wells were improperly constructed. They also claim the 2020 Casper Aquifer Nitrate Loading Study (2020 Wenck study) is flawed because it used incorrect acreages, invalid assumptions, inappropriate WDEQ model inputs, ignored the low-permeability limestone confining layers over the Aquifer, and erroneously assumed no water enters the Aquifer from upgradient areas.

[¶45] Property Owners further argue that the Board's decision was arbitrary and capricious because the Board relied on the limited 2019 Wenck study while disregarding more relevant data in its possession. Specifically, despite having possession of additional water quality and hydrogeologic data since 2017, both the City of Laramie and Albany County elected not to use or rely on that data when justifying the APOZ restrictions. They argue the "most that can be said" of the 2019 Wenck study is that "it attempted to measure the nitrate concentration in soil below one septic system leachfield." They argue the study did not measure actual nitrate concentrations; it did not reach the confining limestone layer overlying the Casper Aquifer; and it did not assess whether nitrates could penetrate the confining layer of limestone. The Property Owners assert that the Board "consistently ignored" long-term monitoring data "showing no [meaningful] change to water quality over time" and "no increase in nitrate levels in the City's public water supply wells." They claim the Board overreacted to isolated nitrate readings above 2.0 mg/L in the City's 2009

---

[9] The 2010 report states, "Overall, it can be observed that nitrate levels were generally similar or lower in the spring 2010 sampling period as compared to fall 2009."

and 2010 sampling events while disregarding Dr. Starkey's long-term study showing no increases in nitrate trend. In short, the Property Owners contend the Board's selective reliance on the flawed 2019 Wenck study, coupled with its disregard of contrary data, rendered the 2023 APOZ amendments—including the 35-acre minimum lot size—arbitrary and capricious.

[¶46] The Board responds that the 2023 APOZ amendments, including the 35-acre lot size, were rationally based on the 2011 CAPP and supporting aquifer studies. In support of its decision, the Board relied on the following:

- The 2011 CAPP, which "recognizes 'large lot zoning' as a potential regulatory management strategy." The CAPP provides, "[l]arge lot zoning would limit the potential for degrading groundwater quality by reducing the density of buildings and on-site wastewater treatment systems within the CAPA. For example, thirty-five acre lots or larger can be designated as large lot zoning."[10]

- Laramie's 2009 and 2010 sampling of private wells which indicated that areas with a higher density of septic systems have increased nitrate levels. ("Data indicate that nitrate-nitrogen levels are most elevated in the East Grand area, and analyses indicate that this could be linked to the high density of septic systems in these subdivisions.").

- A 2013 WWC Engineering study which stated, "precipitation and recharge rates are low in the Laramie area, relatively large lot sizes are required to provide enough recharge to dilute nitrate concentrations to a safe level prior to contaminating a nearby well" and "[t]ypical septic tank and leach field systems are not effective at removing the nitrogen loading from the waste stream." That study also concluded private wells are "at risk of contamination from nitrate originating from septic systems."[11]

---

[10] The 2011 CAPP identified domestic wastewater systems as a concern. It states, "[s]eptic systems in the Casper Aquifer are of particular concern because vulnerable features may provide a direct route for sewage effluent to enter the aquifer. Nitrates, bacteria, and other household wastes are all potential contaminants associated with septic systems." The CAPP also explained:

> The majority of the CAPA is outside of Laramie City limits, so currently all rural homeowners within the CAPA use an on-site small wastewater system. Management of septic systems is a high priority. Elevated nitrate values (4-10.6 mg/l) from drinking water samples within Zone 2 were detected during a Septic System and Water Quality Workshop offered to rural homeowners in January 2001. The U.S. EPA maximum contaminant level is 10 mg/l. In the spring of 2000 the EAC completed a nitrate loading analysis for a high-density subdivision, located within Zone 2 just east of the City limits. This analysis, which followed a methodology promulgated by WDEQ, predicted elevated nitrate levels down gradient from the subdivision[.]

[11] The study stated:

- The 2019 Wenck study's single septic system analysis which found:

  > [T]he vadose zone is capable of removing some nitrogen from the septic effluent, nitrate concentrations entering the unsaturated Casper Formation 25 feet below ground surface are consistently high (51 to 63 mg/L). These conditions indicate that the vadose zone does not remove sufficient nitrogen to protect the Casper Formation and by inference the Casper Aquifer from nitrate contamination.

- The 2020 Wenck study which concluded nitrate levels increase as development densities increase.[12]

[¶47] The Board argues that these studies indicate a larger lot size would decrease the likelihood of contamination of the Casper Aquifer and that in some areas, contamination is already seen, especially in areas of higher density. The Board acknowledges that the grant for the 2019 Wenck study stated that Albany County would not make policy decisions based on data from a single location, but contends even if that study was ignored, other studies and data demonstrate that increased septic system density leads to higher levels of nitrates. The Board argues, based upon these studies and data, the record contains "ample

---

> [A]pproximately 65% of the East Grand area wells that were sampled show nitrate contamination, with 4% of the wells exceeding the drinking water MCL. Of the wells sampled in other areas, approximately 20% show nitrate contamination. Although the mean nitrate concentration at all the wellfields still remain below 2.0 mg/L threshold at which anthropogenic contamination is likely, the apparent increasing trends at the Turner and Soldier wellfields and the sporadic occurrences of concentrations of 2.0 mg/L or greater suggest possible impacts at all except the Pope Wellfield.

[12] That study stated:

> 3. Future build-out modeling under agricultural zoning suggests that development of the APOZ under a 35-acre lot spacing would have some impact on the aquifer, but the model estimates that nitrate concentrations will remain below 10 mg/L (EPA MCL).
>
> .   .   .
>
> 5. The model estimates that development to a level equal to [5-acre lot] Rural Residential Zoning of the Spur and Turner Wellfield blocks will result in elevated nitrate concentrations that exceed 10 mg/L. Nitrate concentrations at this level exceed the EPA MCL.
>
> 6. Finally, the model estimates that development to a level equal to small lot residential (2-acre zoning) within the Turner and Spur Wellfields will adversely impact the Casper Aquifer. If this zoning designation were used in these areas, nitrate concentrations would exceed EPA drinking water standards at both Spur and Turner Wellfields.

evidence" to provide a rational basis for the 2023 APOZ amendments, including the 35-acre minimum lot size.

[¶48] "[A] difference in opinion is not sufficient to show the Board's decision was arbitrary or capricious." *Monaghan Farms, Inc. v. Bd. of Cnty. Comm'rs of Albany Cnty.*, 2023 WY 31, ¶ 60, 527 P.3d 1195, 1215 (Wyo. 2023); *see also N. Laramie Range*, ¶ 46, 290 P.3d at 1079 ("While there is evidence in the record from which two different opinions could be derived, 'action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.'" (citation omitted)).[13] Although the Property Owners and Warren Livestock highlight portions of the record that might support a different conclusion, there is evidence in the record to support the Board's conclusion that the Board's 2023 amendments to the APOZ, including the 35-acre minimum lot size, were rational as they would decrease contamination to the Casper Aquifer.

**B.    35-Acre Minimum Lot Size Does Not Effectively Rezone Land in the Overlay Zone**

[¶49] In their second argument, Appellants assert that the Board's imposition of the 35-acre minimum lot size "completely overrid[es]" all previously established zoning districts, effectively requiring all land in the APOZ to be used as if zoned agricultural.

[¶50] It is true that the 35-acre minimum lot size imposed by the 2023 APOZ amendments conforms to the lot size the ACZR already establishes for property zoned agricultural. ACZR Ch.3, § 2. A. 3 (providing the minimum lot size in districts zoned agricultural is 35 acres). However, use of property in the APOZ is not confined to agricultural uses. Use is defined by the underlying zoning designation, unless further restricted by the APOZ. The APOZ amendments provide, "Where this subsection is less stringent or silent as to a particular issue, any APOZ Developments shall conform to the requirements of the underlying zoning district(s) in which a property is located." Appellants have provided no authority to support the conclusion that minimum lot size incidentally equivalent to

---

[13] The Property Owners state "The Board made no actual findings that there was any significant risk from county residential uses to the Casper Aquifer to necessitate any changes to the APOZ regulations, and especially not to impose an arbitrary 35-acre minimum lot size . . . ." The Property Owners cite no authority for the proposition that the Board was required to make any findings. The plain language of Wyo. Stat. Ann. § 16-3-110 requires agencies to make factual findings in contested case hearings ("A final decision or order adverse to a party in a contested case shall . . . include findings of fact and conclusions of law separately stated."). In *Wilson Advisory Comm.*, ¶ 41, 292 P.3d at 866, we held that agencies "may be required to make factual findings in informal proceedings if required to do so by their own regulations." Other authority states that "While [the arbitrary and capricious standard] is often applied to cases requiring no formal record, the agency must still provide the court with some factual basis for its decision." *Id.* (quoting 6 Jacob A. Stein, et al., *Administrative Law* § 51.03 (2008)). Here, the record is voluminous and, as we concluded above, supports the Board's decision to amend the APOZ regulations.

24

agriculturally zoned property is arbitrary, capricious, or contrary to law, and we decline to consider this argument further.

## C.    The 35-Acre Minimum Lot Size Does Not Contradict Zoning Statutes

[¶51]  We turn to the third argument, that the 35-acre minimum lot size is contrary to Wyoming's zoning statutes, specifically, Wyo. Stat. Ann. § 18-5-201.  Section 18-5-201 provides, in relevant part, "Nothing in W.S. 18-5-201 through 18-5-208 shall be construed to allow any board of county commissioners, through the establishment of minimum lot size requirements or otherwise, to prevent residential or agricultural uses authorized for land divisions that are exempt from subdivision requirements pursuant to W.S. 18-5-303(a)(i). . . ."  Wyo. Stat. Ann. § 18-5-303(a)(i) provides certain divisions of land are exempt from county subdivision requirements.[14]

---

[14] Wyo. Stat. Ann. § 18-5-303(a)(i) provides:

    (a)    Unless the method of sale or other disposition is adopted for the purpose of evading the provisions of this article, this article shall not apply to the following subdivisions of land however, the following subdivisions are subject to requirements which may be adopted by the board of county commissioners regarding documentation of the proper use and implementation of the following exemptions:

        (i)    A division of land made outside of platted subdivisions for the purpose of a single gift or sale to a member of the landowner's immediate family, subject to the following requirements:

            (A)    A member of the immediate family is limited to any person who is a natural or adopted child, stepchild, spouse, sibling, grandchild, grandparent or parent of the landowner;

            (B).    The purpose of the division is to provide for the housing, business or agricultural needs of the grantee;

            (C)    The land shall have been titled in the name of the grantor, or in the name of a trust controlled by the grantor, for a combined period prior to the division of not less than five (5) years for land titled before February 27, 2019, or ten (10) years for land titled on or after February 27, 2019. Parcels created under this paragraph shall be titled in the name of the immediate family member for whom the division is made for a period of not less than five (5) years, or for not less than one (1) year if the parcel was created before February 27, 2019, unless the parcels are subject to involuntary transfer including, but not limited to, foreclosure, death, judicial sale, condemnation or bankruptcy;

            (D)    No parcel smaller than five (5) acres created under this paragraph shall be further divided unless the owner obtains a subdivision permit pursuant to W.S. 18-

[¶52] The Board responds that the County's regulations expressly preserve the statutory exemptions. The Albany County Platting and Subdivision Resolution provides, "no provision of the Albany County Zoning Resolution shall . . . prevent . . . uses authorized for land divisions that are exempt from the requirements of this resolution pursuant to W.S. 18-5-303(a)(i) . . . ." Albany County Platting and Subdivision Resolution Ch.1, § 3. A. (amended May 2024). To the extent a property in the APOZ qualifies for an exemption under § 18-5-303(a)(i), it is exempt from the APOZ's subdivision-related requirements, including the 35-acre minimum lot size. The 35-acre minimum lot size does not contravene Wyo. Stat. Ann. § 18-5-201.

## D. Future Effect of 35-Acre Minimum Lot Size Regulation

[¶53] Finally, Appellants contend the minimum lot size is "unduly restrictive and punitive to every property owner who . . . had a legitimate expectation that they would be able to develop or use their property [including subdividing any property of ten or more acres] in conformance with the established zoning district." Warren Livestock also argues it "[cannot] not seek to change its underlying zoning . . . from agricultural to rural residential [or other zoning districts] even though it is within the growth plate of Laramie." The Property Owners also complain "the imposition of the 35-acre minimum lot size renders every [Property Owner] with less than 35 acres a nonconforming use, which means that they can never expand the use of their properties." Appellants cite no authorities holding zoning changes affecting the expectation of future development or creating nonconforming uses are arbitrary, capricious, or contrary to law.

[¶54] An expectation that property may be subdivided or rezoned in the future is not a vested property right. As we have previously held, "one has a vested property right only in existing land uses, and not in prospective land uses." *Sheridan Cnty. Comm'n v. V.O. Gold Props., LLC*, 2011 WY 16, ¶ 14, 247 P.3d 48, 52 (Wyo. 2011). The creation of nonconforming uses and the disappointment of future development expectations are common and lawful consequences of zoning changes. Appellants cite no authority holding

---

5-304;
(E)    Where the landowner is a business entity and eighty percent (80%) of the ownership interest or shares in the business entity are held by, or in the name of a trust controlled by, individuals related by blood or marriage, the sale or gift may be made subject to the provisions of this section to an immediate family member of any shareholder who has owned at least five percent (5%) of the outstanding shares for at least five (5) years continuously before the date of the sale or gift.

Wyo. Stat. Ann. § 18-5-303(a)(i).

that such effects render a zoning regulation arbitrary, capricious, or unlawful, and we decline to do so here.

## *CONCLUSION*

[¶55] The Board's 2023 APOZ amendments are subject to the arbitrary and capricious standard of review. The Board did not exceed its authority when it adopted zoning regulations to protect the Casper Aquifer. The procedures for amending the overlay zone, which are distinct from procedures used to amend zoning districts, do not violate Wyoming's constitutional equal protection guarantees. Finally, the 2023 amendments, including the 35-acre lot size, were not arbitrary, capricious, or contrary to law. We affirm.

**BOOMGAARDEN, Chief Justice, specially concurring, in which FENN, Justice, joins.**

[¶56]  I agree with the majority that the Board had authority to adopt the 2023 APOZ amendments, that the amendments do not violate equal protection guarantees, that the arbitrary and capricious standard of review applies to agency legislative action, and that the amendments are not arbitrary and capricious. I write separately because we need only look to the language of the WAPA to conclude the arbitrary and capricious standard of review applies to the APOZ amendments.

[¶57]  The parties do not dispute that the Board's adoption of its 2023 APOZ amendments constituted legislative action. As we established in *Bienz I*, "[t]he separation of powers doctrine does not foreclose judicial review of agency legislative action under the WAPA, and there are circumstances where judicial relief is required." 2024 WY 102, ¶ 26, 556 P.3d at 236. The Board's legislative action is therefore subject to judicial review under the WAPA.

[¶58]  The relevant WAPA language is clear. "The reviewing court shall: Hold unlawful and set aside **agency action**, findings and conclusions found to be: (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Wyo. Stat. Ann. § 16-3-114(c)(ii) (2025) (emphasis added). The majority correctly notes that § 16-3-114(c) "does not distinguish between adjudicatory and legislative action." Majority op., ¶ 34.

[¶59]  Given there exists no statutory differentiation, I do not believe we need to rely on federal precedent to reach our conclusion that the arbitrary and capricious standard of review applies to agency legislative action under the WAPA. The plain language of the statute establishes that on its own. And given there is no dispute the Board's adoption of the 2023 APOZ amendments was legislative action, there is no need to further distinguish between adjudicatory and legislative action, or create any informal/formal distinction within each category. As the majority correctly observes, such distinctions do not exist under the WAPA. These distinctions, along with characterizing agency action like the APOZ amendments as "agency actions not developed on a closed record,"[15] have the potential to reinstate the confusion in our precedent we eliminated in *Bienz I*. Majority op., ¶ 41.

[¶60]  As we recognize, "[t]he 'cardinal principle of judicial restraint' is 'if it is not necessary to decide more, it is necessary not to decide more." *City of Laramie v. Univ. of Wyo.*, 2024 WY 13, ¶ 42, 542 P.3d 607, 621 (Wyo. 2024) (quoting *MH v. First Jud. Dist. Ct. of Laramie Cnty.*, 2020 WY 72, ¶ 17, 465 P.3d 405, 410 (Wyo. 2020) (Kautz, J.,

---

[15] The record necessarily closes at some point before judicial review of every agency action, legislative or adjudicative. *See* W.R.A.P. 12.07.

28

specially concurring)). We must "confine ourselves to deciding only what is necessary to the disposition of the immediate case." *MH*, 2020 WY 72, ¶ 17, 465 P.3d at 410 (Kautz, J., specially concurring) (quoting *Whitehouse v. Ill. Cent. R. Co.*, 349 U.S. 366, 372–73, 75 S. Ct. 845, 850, 99 L. Ed. 1155 (1955)).

[¶61] Accordingly, we need only look at the language of the WAPA to conclude the arbitrary and capricious standard applies.

**HILL, Justice**, concurring in part and dissenting in part.

[¶62] I respectfully dissent from the conclusion that the Board has the statutory authority to zone for this purpose. More specifically, I would not find authority for the Board to zone for water quality purposes in the broad, yet general, grant of authority to regulate land use found in Wyo. Stat. Ann. § 18-5-201. I agree with the Appellants that the Board is using its zoning authority as a guise for enacting water quality regulation, and in my view, the Board does not have the authority to regulate water quality.

[¶63] I, much like the majority, begin with the general premise that the Legislature is vested with all the legislative powers of the State, and thus, may do anything legislative in nature as long as it is not repugnant to the United States or Wyoming Constitutions. *Bd. of Trs. of Laramie Cnty. v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 2020 WY 41, ¶ 15, 460 P.3d 251, 258 (Wyo. 2020) (citation omitted). The same is not true of counties. *Id.* Counties "are purely auxiliaries of the State ... and the statutes confer upon them all the powers they possess[.]" *Id.* (quoting *State ex rel. Bd. of Comm'rs of Goshen Cty. v. Snyder*, 212 P. 771, 781 (1923)). The Legislature may delegate a portion of its legislative power over local subjects to municipalities, counties, and other political subdivisions for the purpose of local self-government. *Carter v. Bd. of Cnty. Comm'rs of Laramie Cty.*, 518 P.2d 142, 144 (Wyo. 1974) (citing *Bd. of Trs. of Mem'l Hosp. of Sheridan Cty. v. Pratt*, 262 P.2d 682, 687 (1953)).

[¶64] The Wyoming Legislature has delegated some of its legislative power to Wyoming counties. Among other things, the Legislature has granted counties the authority to regulate the use of land in unincorporated parts of the county. Section 18–5–201 provides:

> [t]o promote the public health, safety, morals and general welfare of the county, each board of county commissioners may regulate and restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use and other purposes in the unincorporated area of the county.

Wyo. Stat. Ann. § 18-5-201. We have held the authority granted by this provision is broad. *Bd. of Cnty Comm'rs of Teton County v. Crow,* 2003 WY 40, ¶ 42, 65 P.3d 720, 734 (Wyo. 2003). I agree this statutory language is a broad grant of authority to counties. I also agree § 18-5-201 confers on counties broad authority to shape their destiny, control their growth, and determine how best to promote the health, safety, morals, and general welfare of their citizens. *Id.* Even so, "there are limits [] upon the zoning powers of a county." *River Springs Liab. Co. v. Bd. of Cnty. Comm'rs of Cnty. of Teton*, 899 P.2d 1329, 1334 (Wyo. 1995).

[¶65]  The powers delegated are only those expressly or impliedly conferred.  *Bd. of Trs. of Laramie Cnty.*, ¶ 15, 460 P.3d at 258; *see also Ford v. Bd. of Cty. Comm'rs of Converse Cty.*, 924 P.2d 91, 95 (Wyo. 1996); *Bd. of Cty. Comm'rs of Laramie Cty. v. Dunnegan*, 884 P.2d 35, 40 (Wyo. 1994).  "Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the [county], and the power is denied."  *Bd. of Trs. of Laramie Cnty.*, ¶ 12, 460 P.3d at 256–57 (citing Dillon on Municipal Corp., 5th ed., [§ 237.]).   I have substantial doubt that the Legislature intended to grant counties the authority to use their zoning power to regulate water quality.

[¶66]  Zoning ordinances implicate the police power of the State.  *Schoeller v. Bd. of Cnty. Comm'rs of Park Cnty.*, 568 P.2d 869, 877 (Wyo. 1977) (quoting Alfred D. Jahr, Eminent Domain, Valuation and Procedure, § 4, p. 8 (1953)).  They affect the property rights of individuals and are in derogation of the owner's rights under the common law.  *Id.*  Zoning authorities must, therefore, be strictly construed and strictly followed.  *Id.*  Zoning authority "must be applied in such a way as to reasonably restrict the actions of boards of county commissioners."  *Id.* at 878.  The authority of a county or municipality to adopt a zoning ordinance is limited by state statute, and the general grant of power to counties to adopt zoning laws in the interest of public welfare does not permit the local governing bodies to override the state law and the policies supporting it.  *Ahearn v. Town of Wheatland*, 2002 WY 12, ¶ 14, 39 P.3d 409, 415–16 (Wyo. 2002) (citing *State ex rel. Baker v. Strange*, 960 P.2d 1016, 1018 (Wyo. 1998); *City of Green River v. Debernardi Const. Co., Inc.,* 816 P.2d 1287, 1290–91 (Wyo. 1991); *Vandehei Developers v. Public Service Comm'n of Wyoming,* 790 P.2d 1282, 1286–87 (Wyo. 1990); *River Springs Ltd. Liability Co. v. Bd. Of Conty. Comm'rs of Teton*, 899 P.2d 1329 at 1337)).

[¶67]  Indeed, both counties and the other public entities created by the Legislature for special statutory purposes exist for the convenient administration of the state government and are created to carry out the will of the State as a whole.  *See Bd. of Cnty. Comm'rs of Cnty. of Boulder v. Hygiene Fire Prot. Dist.*, 221 P.3d 1063, 1068 (Colo. 2009) (citing *Bd. of Cnty. Comm'rs of Douglas Cnty., Colo. v. Bainbridge, Inc.*, 929 P.2d 691, 699 (Colo. 1996); *Romer v. Fountain Sanitation Dist.*, 898 P.2d 37, 41 (Colo.1995)).  Thus, although counties have broad authority to control land use in their county through planning, zoning, and subdivision, they are not superior to other public entities created by the Legislature for specific purposes.  *Id.*  The Legislature is free to determine the scope of county authority, the limitations on county authority, which authority shall be granted to other state agencies or statutory political subdivisions, and how multiple authorities should be coordinated.  *Bd. of Cnty. Comm'rs of Cnty. of Boulder*, 221 P.3d at 1069–70.  When the Legislature makes such determinations, it has made policy decisions we must respect.  *Id.*

[¶68]  Accordingly, it is important to consider the authority granted to other State entities relating to water.  The expression of the statewide importance of water begins in the Wyoming Constitution.  Article 1, § 31 provides, "Water being essential to industrial prosperity, of limited amount, and easy of diversion from its natural channels, its control

31

must be in the state, which, in providing for its use, shall equally guard all the various interests involved." The Constitution further declares that the State of Wyoming owns all ground and surface waters of the State. Wyo. Const. art. 8 §§ 1, 3. The State of Wyoming has placed the authority for the regulation of appropriation and use of water in the exclusive jurisdiction of the Wyoming Office of State Engineer and Board of Control. *See* Wyo. Const. art 8, §§ 2, 5; Wyo. Stat. Ann. § 41-3-909.

[¶69] Through the Environmental Quality Act (EQA), the Legislature has decided to place the authority for the regulation of water quality with the Wyoming Department of Environmental Quality (DEQ). *See* Wyo. Stat. Ann. §§ 35-11-102, -105, 109–110, -114; 35-11-301 through -314. As it relates to water, the EQA is comprehensive in the authority it grants to DEQ. The Legislature used expansive language when it granted authority to DEQ to govern water quality including to set standards for water quality, effluent standards, and the limitations of discharges to the waters of the state. *See e.g.* Wyo. Stat. Ann. § 35-11-102; 35-11-302(a)(i-iii). The powers and duties to promulgate, administer, and enforce the act is vested with the director of the DEQ. DEQ has adopted rules which are designed to protect water quality and potential sources of contamination. The rules DEQ has adopted in accordance with these authorities are, like the statutes, comprehensive. *See e.g.* Wyo. Stat. Ann. § 35-11-114(a) (providing for comprehensive plans to prevent water pollution and protect public water supplies); Wyoming Department of Environmental Quality*,* Water Quality Rules, Ch. 3, 8, 9, 11, 23, 25, 26. DEQ has also created a Watershed Protection Program and a Source Water Wellhead Protection Program.

[¶70] In short, the Legislature has entrusted DEQ with the authority for water quality statewide; and in my view, the EQA shows the Legislature has determined it is the policy of that State that water quality be regulated by DEQ. The statutes and rules are comprehensive, interwoven, and complex. Given the express and comprehensive grant of authority to DEQ for water quality, I cannot agree the Legislature's less specific grant of authority to counties to regulate land use was intended to include the implied authority to regulate the water quality in the county in some general sense.

[¶71] Indeed, as recognized by the majority opinion, within the EQA, the Legislature has at times allowed DEQ to delegate authority or invite local authorities to participate in water quality matters. When it does so, it is explicit. *See e.g.* Wyo. Stat. Ann. §§ 35-11-304; 35-11-306(c); 35-11-309(e). To me, the inclusion of specific language inviting local authorities into certain water quality matters shows the Legislature knows how to delegate authority for water quality matters to counties when it intends to do so. *See e.g.* Wyo. Stat. Ann. § 35-11-304. Because the EQA is explicit in certain delegations of water quality authority, I would find the Legislature only intends local governments to have authority for water quality matters in those specific areas. "We presume that the legislature acts intentionally when it uses particular language in one statute, but not in another." *Matter of Est. of Haack*, 2026 WY 17, ¶ 17, 583 P.3d 690, 696 (Wyo. 2026). Specific designations in some areas shows the Legislature has determined how multiple authorities should be

coordinated and local authority only exists in those areas so designated. *See Bd. of Cnty. Comm'rs of Cnty. of Boulder,* 221 P.3d at 1069–70.

[¶72]   Considering all these authorities, I would find that the Legislature has made a policy decision that water quality is regulated exclusively by DEQ, absent statutory language granting DEQ the authority to delegate some of its authority for water quality matters to other entities.   In this instance, I cannot find a delegation of authority to the county to regulate water quality in the manner it has.

[¶73]   It, therefore, follows that I also do not find the zoning authority found in §18-5-201 includes the power to create water quality regulations.   The State of Wyoming and the Legislature are careful and measured when it comes to water.   Given how explicit both the Wyoming Constitution and the Legislature are when they discuss water, I do not believe the Legislature would have implied authority to regulate water quality in a statute that does not even contain the word "water."   Allowing local zoning regulations to regulate water quality does not reflect the Legislature's intent to harmoniously regulate water quality throughout the State.   It has the potential to create a maze of inconsistent water quality regulations, which does not appear to be the Legislature's intent with respect to water quality.   *See*, Wyo. Stat. Ann. § 35-11-301 through -304.

[¶74]   I further find it telling that the Board removed the original purpose statement which specified that the proposed zoning was for water quality purposes.   If the Board was confident it had the authority to zone for this purpose, there would be no need to amend the purpose statement.[16]   Regardless, in my view, the record makes clear it is the Board's intent to regulate the water quality of the State.   As noted above, as I see it, the Legislature did not intend the broad but general grant of authority to counties to zone land use to include authority to regulate water quality when it expressly granted that specific comprehensive authority to the DEQ.

[¶75]   Certainly, I recognize what this Court said in *River Springs Liab. Co.*, 899 P.2d at 1336, as discussed in ¶ 22 above.   Even so, *Rivers Springs* is illustrative of the point that the authority of counties is limited by the authority granted to DEQ by the language of the EQA. *Id.*   Thus, while our task is to harmonize different statutory provisions and endeavor to afford legitimate effect to all of them; we recognized the land quality provisions of the EQA are comprehensive, explicit, and specific in their grant of authority to DEQ and the pervasiveness of the DEQ's authority was demonstrated by the EQA's exhaustive requirements. *Id.* at 1335–36.   I find this even more apparent in the realm of water quality.

---

[16] I find removing a purpose statement because someone has pointed out a potential problem with your authority especially troubling because it causes citizens to suspect that nefarious government action is afoot. Such actions damage the public confidence in government, including proper and appropriate government actions.

[¶76]   Furthermore, I find a distinction that in *River Springs* the Court was harmonizing the zoning of land uses and land quality regulations. *Id.* In *River Springs,* we had before us a land use that DEQ would allow that might have otherwise been inconsistent with the character and nature of the land use the county envisioned in that area. *Id.* Here we have a different situation. Here, we are comparing land use zoning regulations to water quality regulations. *River Springs* did not consider how land use zoning fits together with water quality matters. As discussed above, I believe the State of Wyoming has taken a very considered and measured approach with water, beginning in the Wyoming Constitution. It has demonstrated its extra concern for the water resources of the State and signaled water as a matter of state level concern. *See* Art. 1, § 31. Following suit, the Legislature is careful when it comes to authority for water related matters.

[¶77]   The clarification of the applicability of the arbitrary and capricious standard, with which I agree, further clarifies the matter for me.[17]   The arbitrary and capricious standard is deferential to agency decision making in part because it flows from the scope of authority granted to the agency which generally carries a level of expertise within that scope. See discussion above, ¶¶ 33–41. Because the matters the Court reviews are within the scope of authority granted and the expertise within the responsible agency, the Court gives the agency considerable deference. The expertise in water quality matters lies with DEQ. The county may very well have expertise in what it wants its county to look like in terms of dividing "land into zones and within these zones the regulation of both the nature of land usage and the physical dimensions of these uses including height setbacks and minimum area." *Pedro/Aspen, Ltd. v. Bd. of Cnty. Comm'rs for Natrona Cnty.,* 2004 WY 84, ¶ 24, 94 P.3d 412, 419 (Wyo. 2004) (citation omitted) (defining "zoning"). But the expertise for water quality lies with DEQ.

[¶78]   Lastly, I note that zoning "must be reasonably calculated to meet the evil and not exceed the public need." *Pheasant Bridge Corp. v. Twp. of Warren*, 777 A.2d 334, 339 (N.J. 2001) (citation omitted). The zoning regulation "must be reasonably designed to resolve the problem without imposing unnecessary and excessive restrictions on the use of private property." *Berger v. State*, 364 A.2d 993, 1002 (N.J. 1976). "Zoning regulations, as an exercise of the police power, are subject to the fundamental rule regarding the exercise of that power: that there is some evil extant or reasonably to be apprehended which the police power may be invoked to prevent." *Salamar Builders Corp. v. Tuttle*, 275 N.E.2d 585, 589 (N.Y. 1971). In this instance, I would not find any of these criteria were met because DEQ is regulating and protecting the water quality of the State. Simply put, the Board is attempting to substitute its judgment for DEQ's, which is not what the statutes contemplate. Indeed, the regulatory scheme designed by the statutes and the DEQ would not prohibit all discharges to the waters of the State but instead implements a permit system to allow for discharges so long as water quality standards are protected. See, Water Quality

---

[17] To be clear, I agree that the arbitrary and capricious standard is applicable to legislative type actions such as zoning.

Rules, Ch. 8, § 4. Although I understand the Board's concern for this sensitive aquifer, "zoning is not a boundless license to structure a [county], and it cannot be used as a means to solve all collateral [county] problems." 101A C.J.S. Zoning and Land Planning § 7. And it certainly cannot be used in excess of the authority granted. Here, I would find that it was.